Gene Edward YOUNG, Plaintiff,

v.

CITY OF CLAREMORE, OKLAHOMA, a body corporate, Defendant.

No. 03–CV–876TCKSAJ.

United States District Court, N.D. Oklahoma.

Oct. 6, 2005.

Guy A Gaylor, OSU Foundation, Stillwater, OK, Charles D Neal, Jr, Earl Truster, Steidley & Neal (McAlester), McAlester, OK, Michele Lynn Schultz, Claremore, OK, Keri Gayle Williams, OSU Foundation, Stillwater, for Claremore, City of, Defendant.

Steven G Polin, Steven G Polin Law Offices, Washington, DC, Todd William Singer, Harris McMahan Peters Thompson & Stall, Tulsa, OK, for Gene Edward Young, Plaintiff.

## ORDER

KERN, District Judge.

Before the Court is Defendant's Motion for Summary Judgment (Docket No. 47), filed June 10, 2005. The Court allowed Plaintiff numerous extensions to respond to Defendant's Motion for Summary Judg-

ment, and Plaintiff filed his response on August 4, 2005.[1] On September 12, 2005, after already granting several extensions of time, the Court allowed Plaintiff to supplement his response brief, which was not in compliance with the rules of this Court or the Federal Rules of Civil Procedure. Plaintiff's supplemental submissions are still not in compliance with the rules of this Court.[2] Nonetheless, the Court has considered, and thoroughly reviewed, all record evidence in reaching its decision.[3]

## I. Background

Plaintiff Gene Edward Young ("Plaintiff") has cerebral palsy, a condition which limits his mobility. Plaintiff uses a golf cart to travel around the City of Claremore ("Defendant"), which is where Plaintiff resides. From October 26, 2003 to the present, Plaintiff has received numerous citations from Claremore police officers for violations of Oklahoma law prohibiting operation of golf carts on public streets, highways, and turnpikes.[4] On December 23, 2003, Plaintiff filed a Complaint herein, alleging causes of action based on the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"), and the Rehabilitation Act of 1973 ("Rehabilitation Act"). Plaintiff seeks a permanent injunction enjoining Defendant from taking further actions that would "interfere in any way with Plaintiff's usage of his golf cart for the purpose of transportation" and a declaratory judgment that Defendant has illegally discriminated against him by "refusing to make a reasonable accommodation to Plaintiff's request" and "by interfering with Plaintiff's equal opportunity to use and enjoy a golf cart for the purpose of transportation and independent living." (*See* Compl. at 12–13.) Plaintiff also seeks compensatory damages, costs, and fees.

On January 23, 2004, this Court denied Plaintiff's Motion for Temporary Restraining Order ("TRO") and/or a Preliminary Injunction. Plaintiff failed to show that the first and third factors of the analysis, which involve irreparable injury and the public interest, weighed heavily and compellingly in his favor. (*See* 1/23/04 Order,

1. The response brief was actually attached as an exhibit to Plaintiff's motion for leave to file his response brief out of time. The Court deemed the response brief attached to such motion as being filed that date, August 4, 2005.

2. Plaintiff refers generally to several different exhibits as the evidentiary support for each fact, rather than referring with particularity to the portions of the record upon which Plaintiff relies, making the Court's task of reviewing Plaintiff's record more difficult. *See* LCvR 56.1(c).

3. Specifically, the Court considered the following: Defendant's Motion for Summary Judgment and exhibits thereto (Docket Nos. 47–50); Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Exhibit A to Docket No. 70); Defendant's Reply (Docket No. 71); Plaintiff's Motion to Supplement Opposition to Defendant's Motion for Summary Judgment and all exhibits thereto (Docket No.

75); Plaintiff's Supplemental Statement of Facts in Material Dispute and exhibits thereto (Docket No. 79); Defendant's Surreply (Docket No. 83); and Joint Statement of the Current Status of the Related State Court Proceedings (Docket No. 85).

4. As of October 26, 2003, the date of Plaintiff's first citation, the prohibition appeared at title 47, section 1151.1 of the Oklahoma Statutes, which provided that "golf carts or all terrain vehicles shall not be operated on the highways or turnpikes of the state" and also provided exceptions for a municipality to allow operation on city streets in certain instances. The prohibition now appears in similar form at title 47, section 1152 of the Oklahoma Statutes. In addition, title 47, section 11–1116 of the Oklahoma Statutes became effective in July of 2004. It prohibits operation of golf carts on "streets and highways," and also sets forth allowable exceptions that a municipality or county may choose to enact.

at 7.) Although the Court denied the Motion for TRO, the Court noted as follows:

> The Court is troubled by the fact that golf carts are allowed on Clubhouse Road in order to access a different portion of a golf course. The fact that signage and warning lights are provided where these golf carts travel illustrates that accommodations have been made for other segments of the population, and perhaps can be agreed upon for Plaintiff as well. If, in fact, the City is willing to allow Plaintiff to drive his golf cart on specific marked routes or at specific times, as is permitted for those driving golf carts on Clubhouse Road, the Court encourages such discussion between the parties. The Court notes the challenges faced by Plaintiff in carrying out everyday activities. To the extent that a safe and reasonable accommodation could be made, this Court encourages such an accommodation to facilitate Plaintiff's desire to live an independent and unimpeded life.

(*Id.* (footnote omitted).) Despite this encouragement from the Court to reach a mutually agreeable resolution as to a reasonable modification, Plaintiff and Defendant have been unable to resolve this matter.

## II. Summary Judgment Standard

A motion for summary judgment is properly granted "if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In applying this standard, the Court must view the evidence and draw all inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mares v. ConAgra Poultry Co.,* 971 F.2d 492, 494 (10th Cir. 1992). Where the non-moving party will bear the burden of proof at trial on a dispositive issue, that party must go beyond the pleadings and identify specific facts which demonstrate the existence of an issue to be tried by the jury. *See Mares,* 971 F.2d at 494.

## III. Statement of Undisputed Facts

Following are undisputed facts relevant to the Court's decision on *Younger* abstention.[5]

1. On October 26, 2003, Plaintiff received a citation, Citation # 73229, for driving his golf cart on the city streets and state highways in Claremore.

2. On December 2, 2003, Plaintiff appeared with counsel before Honorable Robert Post, City Judge for Rogers County, Claremore, Oklahoma. Plaintiff argued before Judge Post that enforcement of the statute against Plaintiff violated the ADA.

3. Judge Post found Plaintiff guilty of violating title 47, section 1151.1(B) of the Oklahoma Statutes. Judge Post considered, but rejected, Plaintiff's arguments regarding federal law. (*See* Transcript of 12/2/2003 Hearing, at 63–64.)

4. On December 9, 2003, Plaintiff filed a Notice of Intent to Appeal Judge Post's decision, asserting that "Title 47 § 1151.1(B) is patently unconstitutional for individuals with disabilities who require the use of a golf cart as a 'mobility device' pursuant to Title II of the Americans with Disabilities Act" and requesting a trial *de*

---

5. On September 26, 2005, the Court ordered the parties to submit a Joint Statement of the Current Status of Related Court Proceedings so that it could fully address Defendant's argument regarding abstention. The parties submitted such statement on September 28, 2005 (Docket No. 85).

*novo* in the District Court of Rogers County.

5. On January 23, 2004, Plaintiff appeared with counsel before the Honorable Joe Smith, in the District Court for Rogers County. On January 23, 2004, Judge Smith conducted a trial *de novo* and also found Plaintiff guilty of violating title 47, section 1151.1 of the Oklahoma Statutes. A transcript of such proceeding is not part of the record in this case.

6. Plaintiff failed to effectuate a timely notice of appeal of Judge Smith's decision to the Oklahoma Court of Criminal Appeals.

7. On June 17, 2004, Plaintiff's counsel filed a "Joint Application for Resentencing" in Rogers County, which states: "Although Appellant's counsel has previously ordered a transcript of the aforementioned proceedings and is presently preparing a Designation of Record and Petition in Error, Appellant's counsel has failed to file a Notice of Intent to Appeal within a timely fashion pursuant to Title 22 § 1051 ... Counsel's failure to timely file ... is solely counsel's error." (Joint App. for Resentencing, at 2.) The application concludes by requesting that the Court "grant Appellant's application for post-conviction relief and allow Appellant to pursue his direct appeal." (*Id.* at 4.) This motion was not opposed.[6]

8. As of September 28, 2005, Judge Smith has not taken any action on the Joint Application for Resentencing. Thus, Plaintiff has not been allowed to effectuate a timely appeal of Judge Smith's ruling to the Oklahoma Court of Criminal Appeals, and the motion has been pending for over fifteen months.

9. Plaintiff was also issued citations on October 26, 2004, December 2, 2004, December 8, 2004, and January 1, 2005, for impermissible operation of his golf cart. The subsequent citations have been "held in abeyance" pending the resolution of the federal court proceedings. Following are undisputed facts relevant to resolution of other claims:

10. Plaintiff has cerebral palsy, which limits his ability to walk.

11. No physician has prohibited Plaintiff from operating an automobile or obtaining a driver's license. Plaintiff has made his own assessment that he cannot operate the foot pedals of a motor vehicle in a safe manner due to his disability and that he lacks the confidence to safely operate an automobile.

12. Plaintiff owns and operates a red, 2002 EZ–Go electric golf cart. Plaintiff has installed headlights, tail lights, turn signals, seat belts, hazard lights, rear view mirrors, and a horn on his golf cart. The golf cart has a maximum speed of approximately 17–22 miles per hour. Plaintiff's golf cart operates with a foot accelerator, brake, and forward, neutral, and reverse gears. Plaintiff's golf cart was manufactured for off-road use and does not conform to the Federal Motor Vehicle Safety Standards of the United States. Plaintiff operates the golf cart on highways and amid regular automobile traffic.

13. Plaintiff, at the time of filing the Complaint, operated the golf cart to travel to his job at Lowe's Home Improvement in Claremore ("Lowe's"). Plaintiff resigned from employment at Lowe's, however, because he was not being scheduled to work enough hours. Plaintiff does not allege he has lost employment or wages because of citations he received from Defendant.

14. Oklahoma law prohibits operation of golf carts on streets, highways, and

---

**6.** Presumably, this motion requests a "resentencing" so that Plaintiff could effectuate a timely appeal.

turnpikes, but also allows municipalities such as Defendant to pass ordinances that allow the operation of golf carts on streets and highways in certain limited circumstances.

15. On July 7, 2003, the Claremore City Council rejected an ordinance that would have allowed disabled adults to operate golf carts on streets and highways in Claremore in limited circumstances as provided under state law.

16. At the time of consideration of the ordinance and throughout this lawsuit, Plaintiff has never agreed to be bound by any restrictions on the operation of his golf cart. He requests, instead, unfettered access to operate his golf cart without restrictions as to route, hours of operation, or type of road traversed. The only restriction by which Plaintiff has agreed to be bound during operation of his golf cart is his own sense of reasonableness.

17. After rejection of the ordinance, Plaintiff continued to operate his golf cart on streets and highways of Claremore.

18. On October 26, 2003, at approximately 7:00 p.m., Officer Richard Jones issued Plaintiff a citation for violation of the state law prohibiting operation of golf carts then in effect. After issuing this ticket, Officer Jones left Plaintiff in the parking lot of QuikTrip, without a ride home.

19. On December 23, 2004, Plaintiff filed this lawsuit requesting temporary and permanent injunctive relief. On January 23, 2004, this Court denied Plaintiff's motion for a TRO.

20. Since this Court's denial of the TRO, Plaintiff has received at least four additional citations for violation of the relevant state law.

21. At all times relevant to this lawsuit, there has existed a marked golf-cart crossing at Heritage Hills Golf Course in Claremore. Golfers cross the highway in their golf carts to traverse from the front nine to the back nine holes of the golf course. This area is marked with cautionary signs, lights, and a posted speed limit of 15 miles per hour. Golfers crossing in this area have never been ticketed. Because Claremore has not passed an ordinance allowing this crossing, the crossing is in violation of state law.

22. Employees at Suburban Chevrolet in Claremore have been photographed operating golf carts off of the dealership parking lot and may have operated the golf carts on streets or highways to arrive at local eateries. They have never been ticketed. Chief of Police Mickey Perry ("Chief Perry") told the employees of Suburban Chevrolet they would be ticketed if caught operating their golf carts in an impermissible manner.

23. The City of Claremore operates a transportation service known as Pelivan, which provides transportation to the elderly and individuals with disabilities. Pelivan's hours of operation are Monday–Friday 8:00 a.m. to 4:00 p.m. and Saturday from 9:00 a.m. to 5:00 p.m.[7]

## IV. *Younger* Abstention

■ Because it could be dispositive, the Court will first address Defendant's argument that the Court should abstain from issuing certain relief based on *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny.[8] "Al-

---

7. Additional facts, as they are relevant to the cause of action being addressed, are set forth in the text of the Court's order.

8. Although Defendant limits its *Younger* abstention argument to certain declaratory relief requested by Plaintiff, the Court finds that the *Younger* doctrine applies to all issues presented and, if applicable, would bar the Court from proceeding. *See D.L., et al. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1228–29 (10th Cir.2004) (stating that *Younger* absten-

though federal courts have a virtually unflagging obligation to exercise the jurisdiction granted them, they must on rare occasions abstain from exercising their jurisdiction in order to 'avoid undue interference with states' conduct of their own affairs." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir.1999) (citations omitted) (quoting *Seneca–Cayuga Tribe v. Oklahoma*, 874 F.2d 709, 711 (10th Cir. 1989)). Under the *Younger* doctrine, a federal court must abstain from exercising jurisdiction when three conditions have been satisfied:

> First, there must be ongoing state criminal, civil, or administrative proceedings. Second, the state court must offer an adequate forum to hear the federal plaintiff's claims from the federal lawsuit. Third, the state proceeding must involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Taylor v. Jaquez*, 126 F.3d 1294, 1297 (10th Cir.1997).

■ With respect to all citations other than the October 26, 2003 citation, the parties have represented to the Court that they are being held in abeyance pending this federal case. Therefore, the Court finds that they do not present "ongoing state proceedings" for purposes of an abstention analysis. *See Southwest Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1178 (10th Cir.2001) (reasoning that where municipal court has stayed its own proceedings in favor of federal resolution of the issues, abstention was not appropriate because it would "function as something close to a writ of mandamus which would not be in harmony with the comity *Younger* was designed to foster").

■ With respect to the October 26, 2003 citation, Plaintiff was found guilty in

the Claremore municipal court, and Plaintiff appealed to the District Court of Rogers County. After a trial *de novo* in the Rogers County District Court, Plaintiff was again found guilty. Plaintiff, however, failed to perfect a timely appeal of this decision to the Oklahoma Court of Criminal Appeals. In June of 2004, Plaintiff requested that the Rogers County court "resentence" him, essentially to allow a direct appeal of his conviction out of time. Fifteen months have passed since Plaintiff requested resentencing, and the motion has not been ruled upon by the court in Rogers County. Therefore, there is no appeal of Plaintiff's conviction before the Oklahoma Court of Criminal Appeals. Further, there is no state proceeding whatsoever in which any substantive issues are being decided. There is merely an unappealed conviction, and a request (that has been pending for fifteen months) to allow Plaintiff to be resentenced, such that his time would begin again to file a direct appeal.

In these circumstances, the Court deems the passage of time in the Rogers County court as either (1) a denial of the motion for resentencing, such that the state criminal proceedings are completely concluded, or (2) a decision to hold the state proceedings in abeyance pending resolution of this Court's decision. Where state criminal proceedings are concluded and the plaintiff in federal court does not seek to overturn or expunge a state court judgment by means of federal intervention, abstention is not appropriate. *See Wooley v. Maynard*, 430 U.S. 705, 710–11, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Here, Plaintiff does not ask the Court to overturn his conviction in the state court proceedings or to expunge his record; instead, he "seeks only to be free from future violations of the same statutes." *See id.* (holding that

tion presents a question of whether a federal court has jurisdiction to proceed with a case).

where relief sought is wholly prospective and in no way designed to annul the results of the state trial, failure to exhaust state appellate remedies does not bar federal jurisdiction). Therefore, assuming the motion for resentencing is denied and the state court proceedings are concluded, the Court finds that abstention is inappropriate despite Plaintiff's failure to exhaust state appellate remedies on the October 26, 2003 conviction.

If the state court proceedings are being held in abeyance, the Court finds that abstention is also inappropriate under such circumstances. *See Southwest Air Ambulance, Inc.*, 268 F.3d at 1178 (stating that abstention is improper where state court proceedings held in abeyance in deference to federal case). In sum, it would be imprudent and would not promote the interest of comity for this Court to "abstain" in deference to state criminal proceedings that are not, in fact, proceeding. Accordingly, the Court will address Plaintiff's substantive claims.[9]

## V. ADA and Rehabilitation Act Claims

Title II of the ADA commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA is modeled on the Rehabilitation Act, and decisional law on the Rehabilitation Act may be relied upon interchangeably in examining claims under the ADA. *See Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 4 (1st Cir.2000). The Rehabilitation Act commands that no otherwise qualified individual with a disability shall, solely by reason of his disability, "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Although Count IV of the Complaint in this case alleges violation of the Rehabilitation Act based on the same facts forming the basis of the claim under the ADA, neither party specifically addresses the claim under the Rehabilitation Act in their briefs before the Court. Plaintiff does not allege that Defendant receives federal assistance in his Complaint (*see* Compl., at 11–12), nor is there any evidence in the summary judgment record regarding Defendant's receipt of federal financial assistance. Therefore, the Court will address Plaintiff's discrimination claims only under the ADA, although the same analysis would apply to both claims.

To establish a violation of Title II of the ADA, a plaintiff must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir.1999). The ADA prohibits both intentional discrimination and disparate-impact discrimination. *See Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 858–60 (10th Cir.2003) (holding that Title II is intended "to remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimina-

---

9. The parties did not raise *Younger* abstention during the TRO proceedings before this Court. In any event, the only difference at that stage of the proceeding was that only six months had elapsed with a failure to rule on the motion for resentencing, rather than fifteen months. Therefore, the Court would have reached the same decision regarding whether the Court had jurisdiction to hear the request for TRO.

tion"). In addition to discrimination motivated by a hostile discriminatory purpose, the ADA also prohibits, in relevant part, discriminatory effects of transportation barriers, failures to make modifications to existing facilities and practices, and overall relegation to lesser services, programs, activities, benefits, or other opportunities. *Id.* at 858.

### A. *Qualified Individual with a Disability*

■ Under Title II, a qualified individual is a person with a disability who, with or without reasonable modifications, meets the essential eligibility requirements to receive public services or participate in a public program. *McGuinness v. Univ. of New Mexico School of Medicine,* 170 F.3d 974, 978 (10th Cir.1998); 42 U.S.C. § 12131(2). It is undisputed that Plaintiff has cerebral palsy and that Plaintiff has difficulty walking. Cerebral palsy is listed as one of the named disabilities in the ADA regulations. *See* 28 C.F.R. 35.104. As a citizen of Claremore, Plaintiff is generally eligible for the benefit of use of streets, roads, and highways in the City of Claremore for the purpose of transportation. Accordingly, the Court finds that Plaintiff is a qualified individual with a disability.[10]

### B. *Exclusion from Public Benefits By Reason of Disability*

■ In this case, Plaintiff claims to have been denied the ability to operate the golf cart as a mobility device, for the purpose of transportation on streets, roads, and highways in Claremore. Therefore, the "benefits of a public entity's services, programs, or activities" from which Plaintiff alleges to have been excluded are the use of streets, roadways, and highways of the City of Claremore for purposes of transportation. As an initial matter, the Court finds that use of the streets, roadways, and highways located in the City of Claremore for purposes of transportation constitutes a public service, program, or activity under the ADA. *See Barden v. City of Sacramento,* 292 F.3d 1073, 1076–77 (9th Cir.2002) (explaining broad definition of "service, program, or activity" and finding that "maintaining accessibility of sidewalks for individuals with disabilities" fit such definition).

Plaintiff claims Defendant excluded him from the above-defined benefit on the basis of his disability in essentially four ways: (1) Defendant failed to grant Plaintiff a reasonable accommodation that would allow him to operate his golf cart on streets, highways, and roadways in Claremore;[11] (2) Defendant intentionally discriminated against him based on his disability by singling Plaintiff out for arrest and prosecution of the relevant state statute, while allowing nondisabled persons to engage in the same conduct; (3) Defendant retaliated against Plaintiff for asserting his rights under the ADA; and (4) Defendant imposed certain regulatory conditions, such as requiring him to have a driver's license, and requiring him to have insurance in his own name, in order to exclude Plaintiff

---

10. Defendant does not appear to dispute that Plaintiff is a qualified individual with a disability. (Def.'s Reply Brief to Pl.'s Supp. Obj. to Def.s' Mot. for Summ. J. at 17.) Although Defendant argues Plaintiff is not a "qualified individual" for the accommodation he seeks because he is capable of operating an automobile, this argument will be addressed in the discussion of the reasonableness of the requested modification.

11. Both parties in this case refer to a request for a "reasonable accommodation." However, this term is only found in Title I of the ADA. The terminology under Title II is a "reasonable modification" of the service or program. However, there appears to be little difference between the two, and they are often used interchangeably. The Court also uses these terms interchangeably.

from the above-defined benefit. (*See* Opposition to Def.'s Mot. For Summ. J., at 6–11.)[12] The Court will address each in turn.

### 1. Reasonable Modification

Because it informs the Court's analysis of whether Defendant must make the requested modification to avoid discrimination under the ADA, the Court first sets forth Oklahoma's statutory scheme addressing the use of golf carts on city streets, roadways, and highways. Title 47, section 11–1116 of the Oklahoma Statutes, which became effective in July 2004, provides in relevant part as follows:

"Self–Propelled or Motor–Driven Cycles—Minibikes, Golf Carts, All–Terrain Vehicles—Prohibitions and Restrictions"
A. The self-propelled or motor-driven and operated vehicles described in this section shall be prohibited from operating or shall be limited in operation on the streets and highways of this state.

. . . . .

C. Golf carts shall not be operated on the streets and highways of this state except:

1. Golf carts owned by the Oklahoma Tourism and Recreation Department .... [under specific limited circumstances];
2. The municipal governing body has adopted an ordinance governing the operation of golf carts on city streets, and the operation occurs during daylight hours only;
3. Golf carts may operate on state highways only if making a perpendicular crossing of a state highway located within the boundaries of a municipality which has adopted an ordinance governing the operation of golf carts; or
4. The board of county commissioners of a county has approved the operation of golf cart traffic on roadways within the county, and:
a. the roadway has a posted speed limit of twenty-five (25) miles per hour or less,
b. the roadway is located in an unincorporated area, and
c. appropriate signage, cautioning motorists of the possibility of golf cart traffic, is erected by the board of county commissioners.[13]

---

**12.** In his Complaint, Plaintiff alleges Defendant violated the ADA and Rehabilitation Act in eleven ways: (1) discriminating against Plaintiff by denying Plaintiff the opportunity to use his golf cart as a mobility device because of his disability; (2) applying the Oklahoma statute prohibiting the operation of golf carts on highways in an arbitrary and capricious manner; (3) utilizing licensing and permit requirements to provide municipal code enforcement services that are not equal to non-disabled persons and disabled persons; (4) employing state law to segregate and reject Plaintiff because of his disability; (5) utilizing licensing and permit requirements to deny benefits to the disabled; (6) discriminating against Plaintiff in the provision of municipal services and facilities in connection with those traveling public streets and sidewalks; (7) restricting Plaintiff, because of his disability, from choosing to use as a golf cart as a mobility device to discourage Plaintiff from living independently; (8) intimidation and threatening Plaintiff because of his disability; (9) failing to make reasonable accommodations in the application of state and local ordinances so as to allow Plaintiff to live independently; (10) employing state and local laws to segregate and reject Plaintiff because of his disability; and (11) utilizing its police powers to deny Plaintiff the enjoyment of benefits enjoyed by other non-disabled persons. (*See* Complaint at 8–9, 11–12.) These can be narrowed and summarized as set forth above and as set forth by Plaintiff in his Opposition to Defendant's Motion for Summary Judgment.

**13.** *See also* OKLA. STAT. tit. 47, § 1151(E)(2) (prohibiting use of golf carts on streets or highways of Oklahoma, except as provided in Section 11–1116, set forth above); OKLA. STAT. tit. 47, § 1152 (prohibiting operation of golf carts on highways and turnpikes).

OKLA. STAT. tit. 47, § 11–116. Under this scheme, operation of golf carts is generally forbidden on streets and highways (by § 11–116) and also on turnpikes (by § 1152). A municipality, such as Defendant, may allow use of golf carts on city streets, but only during daylight hours. A county may allow operation of golf carts on roadways in unincorporated areas where the speed limit is 25 miles per hour or less, if accompanied by warning signs. A golf cart may cross a state highway in a perpendicular manner, if the highway is in a municipality which has adopted an ordinance governing the operation of golf carts.[14] Oklahoma also has a specific statute addressing the use of golf carts in state parks by persons with disabilities:

*"Operation of Golf Carts by Persons with Physical Disabilities"*

A. Notwithstanding any other provision of law, any person with a physical disability as defined by Section 15–112 of Title 47 of the Oklahoma Statutes shall be authorized to operate golf carts to the extent that the physically disabled person is capable as determined by a physician as defined by Section 15–112 of Title 47 of the Oklahoma Statutes if:
1. Such operation is within the boundaries of a park owned by this state;
2. Operation occurs during daylight hours only;
3. The golf cart does not exceed the speed limit in such area as determined by the Oklahoma Tourism and Recreation Department;
4. The golf cart is not operated on roadways within park boundaries with posted speed limits greater than twenty-five (25) miles per hour;
5. The operator of such golf cart possesses a valid driver license; and

6. The operator of such golf cart shall provide certified proof of his or her disability.
B. The Tourism and Recreation Commission shall designate areas of operation for golf carts in each state park as appropriate, and establish rules for the safe operation of golf carts pursuant to this act.

OKLA. STAT. tit. 47, § 1151.2. Thus, the State of Oklahoma has a significant statutory scheme governing· the use of golf carts by all people, and exceptions that can be made to that rule at the option of a municipality or county. Oklahoma also has a specific statute allowing the use of golf carts by people with disabilities in one limited circumstance. With this scheme in mind, the Court turns to the issue of whether Defendant has requested a reasonable modification to the local program or service, which would allow him an exception to the general prohibition on operation of golf carts on streets and highways.

The ADA regulations provide guidance as to the obligation of a public entity to an individual with a disability in the provision of its services or programs. The focus is on "accessibility":

[N]o qualified individual with a disability shall, because a public entity's facilities are *inaccessible to or unusable by individuals with disabilities,* be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

28 C.F.R. § 35.149 (emphasis added). Interpreting this and related provisions under the ADA, the First Circuit stated as follows: "A public entity must make its service, program, or activity 'when viewed

---

14. The Court notes that if a municipality has adopted an ordinance governing the operation of golf carts as required by the provision, that ordinance would necessarily provide that operation occur only during daylight hours.

in its entirety,' 'readily accessible to and usable by individuals with disabilities,' except where compliance would result in a 'fundamental alteration' or an 'undue burden.' " *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir.2000) (citing 28 C.F.R. § 35.150(a) and 35.150(a)(3)). In the context of the Rehabilitation Act, the U.S. Supreme Court has stated that, with respect to accessibility, there must be a

balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones.

. . . . .

The balance ... requires that an otherwise qualified handicapped individual must be provided with *meaningful access* to the benefit the grantee offers.

*Alexander v. Choate*, 469 U.S. 287, 300, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (emphasis added). "Meaningful access" means providing reasonable modifications to a program or benefit, and reasonable modifications are those that do not require either a modification of the essential nature of a program or impose an undue burden on the program provider. *See Galusha v. New York State Dep't of Environmental Conservation*, 27 F.Supp.2d 117, 123–24 (N.D.N.Y.1998).

■ Defendant first argues that Plaintiff has not been deprived access to the benefit of public streets in Claremore for the purpose of transportation because Plaintiff has never been prohibited by a doctor from operating an automobile and because Plaintiff has the physical ability to operate an automobile. The reasons Plaintiff uses a golf cart instead of an automobile to access the streets, roads, and highways of Claremore are stated by Plaintiff as follows:

But you step on that [golf cart] pedal, you know with an absolute certainty, whatever the top speed of that golf cart, it's going to get to that top speed and it's not going to go any further. And I feel—and you can't crawl inside my skin, per se, and understand what level of comfort that gives me.... But you get in a car, ... then you have this going around in your head, whether it's modified or not, you pull on that lever, and then you have to, then you have to, quote, get in the other rat race, per se.... And so—but yet, I get in the golf cart and I'm like, it goes this speed, no faster, I feel safe, comfortable, you know, reasonable.

(Ex. A. to Def.'s Mot. for Summ. J., at 214–15.) At the TRO hearing, the Court had the following exchange with Plaintiff:

Q: [Judge Kern] I think I understood from the earlier questioning, but you do have the ability to drive an automobile, you just are not confident in doing so?

A: [Plaintiff] That's part of it, Your Honor, yes.

Q: And the golf cart you drive by pressing down on the pedal with your foot?

A: Well, yes, and it doesn't—as you know, it doesn't accelerate as rapidly and ... you step on the gas of an automobile, you're going to go zero to 60, depending on what type of automobile, pretty quick.

Q: Does your medical condition prevent you from having control of your leg and foot such that you could not be able to control the speed of the automobile?

A: In my opinion, yes, because, you know ... the faster you go, the more anxious you get, you know, a lot of things, the heart races plus -

Q: Well, I'm not concerned about that -

A: Well, I mean, when you -

Q: I'm concerned -

A: when you say—are you saying does my medical condition make it more difficult to press down on the pedal? Is it -

Q: That's what I'm asking.

A: Well, I can press down on the pedal of the golf cart and that's what I've always been used to doing.

Q: Have you ever driven an automobile with hand controls?

A: No, sir, I have not. I've never been able to even afford thinking about getting in one.

Q: All right. But your medical condition doesn't prevent you from slowly pressing down on an accelerator and controlling it?

A: No, it doesn't. I've been able to do that.

(Ex. B to Def.'s Mot. for Summ. J., at 62–63.) Based on these statements by Plaintiff, the reason Plaintiff chooses to traverse the streets and highways of Claremore by golf cart is that he gets more anxious in an automobile due to its potential speed, rather than a complete inability to operate an automobile based on his physical disability. Thus, Plaintiff is not being deprived all access to transportation on Defendant's roads by reason of his disability. This is evidenced by the fact that a golf cart is accelerated and stopped in a similar manner to an unmodified automobile.

In *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 682, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001), the Supreme Court noted that plaintiff's requested modification of use of a golf cart was necessary for receipt of the benefit since he was unable to walk the golf course at all. The Court contrasted this with a plaintiff for whom walking the course may be "uncomfortable or difficult" but not beyond his capacity. *Id.* In such cases, the Court noted that "an accommodation might be reasonable but not necessary." *Id.* Plaintiff in this case is not a disabled individual who must have an accommodation to receive the benefit; instead, it is a question of whether the accommodation requested by that person is reasonable in light of his disability and other circumstances presented. Thus, the fact that Plaintiff's requested accommodation is not absolutely necessary in order for Plaintiff to access the roads does not, in and of itself, entitle Defendant to summary judgment. Instead, it is merely a consideration in the analysis of whether Defendant must provide Plaintiff the accommodation requested in order for Plaintiff to have "meaningful access" to the benefit.[15]

The plaintiff has the initial burden of proving that a modification was requested and that the requested modification is reasonable. *See Johnson v. Gambrinus Company/Spoetzl Brewery,* 116 F.3d 1052, 1059 (5th Cir.1997) (in context of Title III "public accommodation" analysis); *Colorado Cross Disability Coalition v. Hermanson Family Ltd.,* 264 F.3d 999, 1004 (10th Cir.2001) (recognizing holding in *Johnson,* also in context of Title III). The plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, or "reasonable in the run of cases." *Id.*

*The Requested Modification*

In July 2003, Claremore had not adopted an ordinance pursuant to the Oklahoma law allowing exceptions to the

---

**15.** Contrary to Defendant's arguments, if the reasons Plaintiff feels more anxious in an automobile relate to his physical disability, as opposed to his age or a general fear of driving at high speeds, the denial of benefits may be "based on" his disability. For purposes of summary judgment, the Court assumes Plaintiff's anxiety stems from his disability, rather than a characteristic shared by other segments of the population.

prohibition of operation of golf carts on streets and highways. In an effort to address the needs and concerns of Plaintiff, on July 7, 2003, Chief Perry presented to the City Council an ordinance that would have been enacted pursuant to OKLA. STAT. tit. 47, § 1151.1(D). The proposed ordinance, which was entitled "An Ordinance Prohibiting Operation of Golf Carts on Certain City Streets During Daylight Hours; And Stating Limitations and Exceptions," provided that "golf carts may be operated by physically disabled adults on roadways having a speed limit of twenty-five (25) miles per hour or less during daylight hours." The ordinance further provided that golf carts could cross streets or highways that had a posted speed limit of greater than 25 miles per hour. The ordinance also would have required a person driving a golf cart on city streets to obtain a driver's license. The minutes reflect that Plaintiff spoke "for" the golf cart ordinance at the City Council meeting. However, it is also undisputed that, at this meeting, Plaintiff stated that he would refuse to be bound by any restrictions on where and when he operated his golf cart, even after passage of the ordinance. The City Council unanimously rejected the ordinance. To this date, the City Council has not adopted such an ordinance.

In a demand letter sent on December 17, 2003, from counsel for Plaintiff to the City Prosecutor of Claremore, Plaintiff's counsel requested the "following immediate reasonable accommodations to be made for Mr. Young: allowing Mr. Young the unfettered use of his mobility device (golf cart) throughout the City of Claremore." In the Complaint filed in this lawsuit on December 23, 2003, Plaintiff requests, *inter alia*, a permanent injunction prohibiting Defendant from "interfer[ing] in any way with Plaintiff's usage of his golf cart for the purpose of transportation."

Plaintiff does, however, state in his deposition that "reason has to come into it" (Ex. A. to Def.'s Mot. for Summ. J., at 120:9–10.) For example, Plaintiff states:

There again, I'm not a kid, so I know how to—you know, life doesn't stop when the sun goes down, and yet if a person is reasonable in how they travel and the manner they travel ... so there has to be ... some reasonableness exercised, you know. Because like I said, I'm not a kid. I have responsibilities and things to do just like everybody else.

(Ex. A. to Def.'s Mot. for Summ. J., at 104:1–8.) In addition to exercising his own sense of reasonableness, Plaintiff has stated that he is willing to restrict his travel to streets posted with warning signs, "as long as there's plenty of those signs that doesn't just keep me in my neighborhood." (Ex. B to Def.'s Mot. for Summ. J., at 55:19–22.) Plaintiff does not, however, offer the Court proposed designated areas that would be sufficient to not "just keep [him] in his neighborhood."

In his response brief, filed August 4, 2005, Plaintiff states that he "was a proponent of a proposed ordinance to the City Council that would have authorized operations of golf carts on city streets during daylight hours by disabled persons." (Plf.'s Opp. to Def.'s Mot. for Summ. J., at 7.) However, nowhere in the record, including the various requests for relief and Plaintiff's deposition, does Plaintiff state that he is willing to submit to restrictions on the hours of operation on his golf cart. In fact, Plaintiff expressly denied such a willingness during his deposition. (Ex. A. to Def.'s Mot. for Summ. J., at 203:9–11.)

The Court views Plaintiff's requested accommodation as unlimited access to operate his golf cart on all types of roads at all times of day, with the caveat that he will exercise his own sense of reasonableness.

This would include not only crossing streets or highways, but also traveling down the streets in the lanes of traffic, if Plaintiff determined this was reasonable under the time and circumstances presented. The Court will proceed to analysis of such request.

*Reasonableness of Requested Modification*

■ The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program. *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In addressing a proposed reasonable modification of a state law, the Ninth Circuit has held as follows:

> The court's obligation under the ADA ... is to ensure that the decision reached by the state authority is appropriate *under the law and in light of the proposed alternatives*. Otherwise, any state could adopt requirements imposing unreasonable obstacles to the disabled, and when haled into court could evade the antidiscrimination mandate of the ADA by explaining that the state authority considered possible modifications and rejected them.

*Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir.1996) (emphasis added). The mere fact that a state legislature has already considered a plaintiff's proposed alternatives and rejected them does not end the federal court's inquiry. *Id.* However, the Court should remain mindful of the general principle that courts will not second guess the public health and safety decisions of state legislatures. *Id.*

■ After careful consideration of (1) the Oklahoma state law allowing (rather than rejecting) particularized modifications

of the ban on operation of golf carts in specific circumstances, which is expressly designed to reduce the safety risks associated with operation of golf carts on streets; and (2) the only alternative proposed by Plaintiff, which is unfettered access to operate his golf cart around Claremore, the Court finds the modification requested by Plaintiff in this case is unreasonable as a matter of law.

Although it is true that reasonableness of a requested modification is usually a question of fact requiring a fact-intensive inquiry, *see id.*, Plaintiff presents the Court with only one alternative, which is unfettered access. This case also involves undisputed facts (which are in many ways self-evident) regarding the health and safety risks associated with a golf cart traversing public streets and highways in the flow of vehicular traffic. Further, this case presents a circumstance where the state has considered, and in fact allowed (rather than rejected), modifications to the prohibition on operation of golf carts, but Plaintiff is requesting a modification that does not fit into these allowable modifications. Based on the undisputed facts presented, no factfinder could determine that the proposed alternative in this case—which would require an exception to a statutory scheme that already offers well-defined exceptions and which would involve no restrictions except Plaintiff's own sense of reasonableness—is a reasonable modification. *Compare, e.g., Crowder*, 81 F.3d at 1486 (inquiry into reasonable modification would necessitate findings of fact regarding the nature of the rabies disease, the extent of the risk posed by the disease, and the probability that the infected animals spread it).[16]

---

16. To be clear, the Court does not find the record to show that Plaintiff is an unreasonable person nor does the Court comment on his reasonableness in the operation of his golf cart. The Court must consider the reasonableness of the proposed modification in the general sense.

Further, the overarching consideration is whether the requested modification is reasonably necessary to allow Plaintiff "meaningful access" to the benefit at issue. The undisputed facts are that Plaintiff can physically operate an automobile, and that his golf cart is operated in a similar manner to an automobile. Further, Defendant offers a transportation service to the disabled, Pelivan, that has normal hours of operation and that could transport Plaintiff around Claremore, which is a city consisting of approximately 15 square miles. Under these circumstances, Plaintiff cannot make a showing that "unfettered access" to all types of roads at all hours is a reasonable modification to allow Plaintiff to enjoy "meaningful access" to the benefit at issue.

In arguing his accommodation is reasonable, Plaintiff principally relies on Illustration 3 to Section II–3.6100 in the Title II Technical Assistance Manual, which is as follows:

II–3.6000 Reasonable modification

II–3.6100 General—A public entity must reasonably modify its policies, practices, or procedures to avoid discrimination. If the public entity can demonstrate, however, that the modifications would fundamentally alter the nature of its service, program, or activity, it is not required to make the modification.

. . . . .

Illustration 3: A county ordinance prohibits the use of golf carts on public highways. An individual with a mobility impairment uses a golf cart as a mobility device. Allowing use of the golf cart as a mobility device on the shoulders of public highways where pedestrians are permitted, in limited circumstances that do not involve a significant risk to the health or safety of others, is a reasonable modification of the county policy.

Here, there is no evidence in the record that Plaintiff requests use of the golf cart only on "shoulders of public highways where pedestrians are permitted." [17] Instead, Plaintiff currently operates, and requests injunctive relief allowing him to operate, the golf cart within the lanes of traffic similar to an automobile, and to cross lanes of traffic in areas that are not marked with warning signs, lights, or other designation. The illustration relied upon by Plaintiff contemplates the golf cart being used by the disabled individual in an area where pedestrians are typically permitted to walk, not in an area where automobiles typically drive. As to the language in the illustration regarding "limited circumstances that do not involve a significant risk to the health and safety of others," the Court will address the health and safety considerations in detail below.

Plaintiff also relies on the case of *Bertrand v. City of Mackinac Island*, 662 N.W.2d 77 (Mich.App.2003), as support for his position. In *Bertrand*, the court affirmed the grant of a permanent injunction allowing plaintiff to use an electric-assist tricycle, despite a local ordinance barring use of all motor vehicles. The City of Mackinac Island is a tourist city that generally bans the use of all motor vehicles

---

**17.** For purposes of summary judgment, the Court assumes that Plaintiff uses his golf cart as a "mobility device" under the ADA. However, the Court notes a golf cart does not fit the definition of "mobility device" under Oklahoma law, which is as follows:

"Electric personal assistive mobility device" means a self-balancing, two nontandem-wheeled device, designed to transport only one person, having an electric propulsion system with an average of seven hundred fifty (750) watts (1 h.p.), and a maximum speed of less than twenty (20) miles per hour on a paved level surface when powered solely by such a propulsion system while ridden by an operator who weighs one hundred seventy (170) pounds.

OKLA. STAT. tit. 47, § 1–114A.

but allows walking and cycling as means of transportation on its streets. Cycling is the primary means of transportation of most citizens. The ordinance excepted from the ban certain electric scooters and wheelchairs when used by a person with a disability as a mobility device and as prescribed by a doctor. Plaintiff desired to use an electric tricycle, which had regular bicycle pedals and an electric assist and traveled at approximately 10–12 mph. The city argued that the tricycle did not fall within the allowed exception, and that it had already offered a reasonable accommodation by making exceptions for mobility devices such as wheelchairs. The court held that the specific benefit of which plaintiff was being deprived was the ability to cycle on the streets and held as follows:

> The relevant activity open to the nondisabled in this case is the ability to cycle on the defendant's public streets. Allowing disabled persons to use electric wheelchairs and Amigo carts on the streets may well reasonably accommodate the disabled with regard to the analogous activity by the nondisabled of simply walking on the streets, but, it is plain that it is not reasonably analogous to being able to cycle on the streets.

The court further reasoned that "with the adaptive aid of an electric motor, plaintiff has the ability to use those streets for cycling purposes in the same manner as the nondisabled." *Id.* at 23, 662 N.W.2d at 82.

The *Bertrand* decision is not helpful to Plaintiff and, in fact, demonstrates that Plaintiff cannot show that his request is generally reasonable. In this case, Oklahoma law provides exceptions to the general ban on golf carts being used on streets and highways, and these exceptions directly apply to the requested activity— operation of a golf cart on a street for the purpose of transportation. Unlike the alleged "modification" allowed by the defendant in *Bertrand,* which did not meet the need to cycle, the exception under Oklahoma law, were it to be agreed to by Plaintiff and enacted by Defendant, meets the precise activity of operating a golf cart on streets and highways for purposes of transportation. Further, Defendant offers Pelivan, which transports people with disabilities around Claremore during certain hours. This is sufficient to reasonably accommodate the disabled with respect to the analogous activity of driving an automobile on the streets of Claremore. *See id.*

Further, in *Bertrand,* the court reasoned that the modification to the ban on motorized vehicles would allow the plaintiff to use the streets for cycling purposes "in the same manner as the nondisabled." In this case, modification of the ban on operation of golf carts would not allow Plaintiff to use the streets "in the same manner as the nondisabled" (as the electric tricycle could be used the same as a bicycle). For obvious reasons, a golf cart cannot be "used in the same manner" as a motor vehicle on the public streets. The golf cart at issue in this case has a maximum approximate speed of 17–22 mph. This is precisely why there are state laws limiting their use, providing specific circumstances under which use of a golf cart may be permitted by a local government, and providing limited exceptions for people with disabilities at one type of public accommodation.

The Court also finds the case of *Galusha v. New York State Dep't of Environmental Conservation,* 27 F.Supp.2d 117, 123 (N.D.N.Y.1998), instructive. In that case, the court addressed a claim that restrictions on use of motorized vehicles in a park resulted in a denial of meaningful access to various trails and paths. In granting a TRO, the court reasoned that "without the assistance of motorized transport, disabled Plaintiffs effectively have zero access to

Santanoni and other Forest Preserve crown jewels." *Id.* at 124–25. Here, Plaintiff and other disabled individuals have general access to the streets of Claremore via the Pelivan service provided. *See also Slager v. Duncan,* Case No. 97–2301, 1998 WL 558764 (4th Cir. Aug.28, 1999) (plaintiff did not make sufficient showing that he was "denied access" to transportation available to nondisabled by alleging he suffered pain when driving over speed bumps). Although Plaintiff is dissatisfied with the hours of Pelivan, Plaintiff is not entitled to every modification he requests but instead entitled only to meaningful access. *See Hankins v. The Gap, Inc.,* 84 F.3d 797, 800–01 (6th Cir.1996) (where defendant made available other reasonable and effective accommodations to an employee, it did not matter whether other accommodations would have also been reasonable).

*Direct Threat*

 Even assuming plaintiff could meet its burden of showing a reasonable requested modification in the general sense, the undisputed, objective evidence in the record shows that the requested modification will result in a "direct threat" to the safety of others. Under the ADA, concerns for public safety may override a requested accommodation:

> Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities privileges, advantages, and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182(b)(3). The existence or nonexistence of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on objective evidence. *See Bragdon v. Abbott,* 524 U.S. 624, 648, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). A public entity must make an individualized assessment, based on reasonable judgment, to ascertain the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications will mitigate the risk. 28 C.F.R. § 36.208(c).

Defendant maintains that the best available objective evidence that Plaintiff's requested modification would pose a significant risk is that his golf cart was manufactured for off-road use and does not conform to the Federal Motor Vehicle Safety Standards of the United States ("FMVSS"). Defendant offers evidence that Plaintiff's operation of his golf cart among other vehicles in the requested manner poses safety risks associated with, *inter alia,* accelerating and braking, attaining sufficient speeds, lack of windshield wipers, and the effectiveness of the seatbelts that Plaintiff has installed. Plaintiff has offered no facts to dispute that operation of his cart poses a safety risk to others or, even more significantly, that he intends to limit use of his cart to specified routes or designated slow-speed areas that would limit the alleged risks. Instead, Plaintiff argues that Defendant's alleged safety risks are based on impermissible "speculation or stereotypes." However, it is not speculative or stereotyping for Defendant to assert that, due to the significant size, weight, and speed differences between a golf cart and a motor vehicle, Plaintiff's golf cart poses significant safety risks. This is simply not a case in which fears of the possible effects of the requested modification are unfounded, unknown, biased based on disability, or overly speculative. *Compare,*

*e.g., Bragdon,* 524 U.S. at 649, 118 S.Ct. 2196 (finding that doctor's belief that significant risk existed by treating HIV patient was too speculative and not based on medical evidence). Plaintiff has, in fact, had one accident with a vehicle while driving his golf cart. Because Plaintiff's vehicle was not at that time insured, the other party had to bear the expense associated with that accident.[18]

Based on these facts, the Court concludes that Defendant has set forth undisputed, objective, reasonable evidence of the direct threat to the safety of himself and others posed by operation of Plaintiff's golf cart on streets in an unrestricted manner. Again, because Plaintiff in this case requests unfettered access, it is impossible for Defendant to take steps to "mitigate" or eliminate the safety risks posed as suggested by the "direct threat" provision of the ADA and as suggested by the illustration in the Title II Technical Assistance Manual.[19]

### 2. *Intentional Discrimination*

Plaintiff alleges Defendant has engaged in intentional discrimination under the ADA by singling him out based on his disability for arrest and prosecution of Oklahoma law. This allegation is based on the following: (1) there exists a well-marked crossing across a highway for golf carts from the front nine to the back nine at Heritage Hills Golf Course on Country Club Road, and golfers are never ticketed for crossing there; (2) employees of the Suburban Chevrolet dealership in Claremore use golf carts to travel the access road of Highway 66 from the dealership to local eateries; (3) Mr. Yondell Lewis, a mentally disabled individual, has been allowed to operate a riding lawn mower on certain roadways without being ticketed; (4) Officer Rick Jones, who arrested him on October 26, 2003, allegedly stated that "I have been reading about you and waiting for you Mr. Young, and I have been looking forward to issuing this ticket" and that "if I ever see using this golf cart in the future, I will remove it and impound it ..." and also left Plaintiff in the QuikTrip parking lot after ticketing him without offering him a ride home; and (5) Police Chief Mickey Perry stated that Plaintiff angers him because it "seems that he is snubbing his nose at us when he drives past the police station in his golf cart."

Case law offers little guidance in addressing a claim of intentional discrimination under Title II of the ADA. "No reported opinion of this court has yet articulated the essential elements of a claim of intentional discrimination under Title II of the ADA, or detailed what a plaintiff must plead at a minimum to establish such a claim. Nor has this court offered any specific guidance to 'sharpen the inquiry into the elusive factual question of intentional discrimination,' other than to suggest that a plaintiff must show the challenged conduct was moti-

---

18. Although Plaintiff argues in his response brief that Plaintiff "can operate his golf cart safely on specified routes by giving adequate warning to motorist [sic] that the route is traversed by a golf cart," Plaintiff has not requested a modification involving specified routes and has not indicated any willingness to be restricted in such a manner. A grant of the relief requested in this lawsuit would result in no "interference" or restrictions whatsoever.

19. The Court does not specifically address the question of a "fundamental alteration" or "undue burden," although the Court has considered the alterations or burdens on Defendant in determining the overall unreasonableness of the requested modification. The same safety problems addressed in the "direct threat" analysis would cause Defendant to be forced to make a "fundamental alteration" in its "program" of providing safe streets, in light of the unlimited and unrestricted nature of Plaintiff's request in this case.

vated by discriminatory animus." *See Tyler v. City of Manhattan,* 118 F.3d 1400, 1405 (10th Cir.1997) (citations omitted). The Court will consider whether Plaintiff has created an issue of fact as to whether the challenged conduct (issuing citations for violations of state law) was motivated by discriminatory animus, and will also consider the traditional burden-shifting used in Title I cases. *See Tyler,* 118 F.3d at 1405 (explaining two possible appropriate tests).

With respect to golfers at Heritage Hills, Defendant submits they are not ticketed because Defendant has installed lights, warning signs, and a posted speed limit of 15 mph at this crossing, and has established this as a specific area in which golf carts are allowed because specific safety measures have been taken. Plaintiff is correct that this is in violation of the state law, since Claremore has no ordinance allowing an exception to the ban. Plaintiff is also correct that this shows that Defendant is willing to make modifications in some instances. The Court does not agree, however, that the evidence creates an issue of fact as to whether Plaintiff has been singled out for prosecution *based on his disability.* Instead, the record shows that golfers are not ticketed because they are crossing for a limited time, under limited circumstances, and at a well-marked area from the front nine to the back nine while playing golf. The crossing is over sixty-six (66) feet of road. This is in contrast to Plaintiff, who currently operates his golf cart amidst traffic and on the streets at will, sometimes traveling several miles at a time. This legitimate, non-discriminatory reason for the differences has been stated by Defendant, and Plaintiff has not made a showing sufficient on the issue of pretext.

With respect to the employees of Suburban Chevrolet, Plaintiff has presented no evidence that they are not ticketed because they are not disabled. Instead, the record evidence shows that they have not been ticketed because they have not been caught. Plaintiff's friend, Mr. Stanley, who photographed the Suburban Chevrolet golf carts, admits that he did not contact the police at the time the photos were taken. Chief Perry, in fact, expressly warned the employees they would be ticketed if caught operating their golf carts on city streets or highways. With respect to Mr. Lewis, Plaintiff also lacks evidence to show that a police officer ever witnessed, but failed to ticket, Mr. Lewis while operating his lawn mower on city streets. Even assuming officers did fail to ticket him, this would not help Plaintiff prove that his citations are based on discriminatory animus, since Mr. Lewis himself suffers from a disability. Again, the legitimate, non-discriminatory reason offered by Defendant for differing treatment is that these individuals have not been caught.

With respect to Chief Perry, he is the person who proposed the city ordinance to allow a reasonable modification for Plaintiff. The isolated comment cited by Plaintiff regarding him "snubbing his nose" at officers evidences only general frustration at Plaintiff's violation of the law and is insufficient to make a prima facie showing of discrimination or to create pretext.

With respect to the alleged comments by Officer Jones during the October 26, 2004 arrest, Officer Jones states Plaintiff was traveling directly in front of him when he pulled him over for violation of the law. Officer Jones also testified that he was not aware of the precise nature of Plaintiff's disability, and that he left Plaintiff at Quik-Trip because Plaintiff was agitated with Officer Jones. The Court finds the only potential evidence of discriminatory animus to be Officer's Jones alleged comment that "he had been waiting" for Plaintiff. However, this comment, taken in context

of a valid traffic stop for someone who consistently engages in violations of a law, does not evidence discrimination based on Plaintiff's disability. In any event, the Court finds this lone comment to be insufficient to make a prima facie showing of discriminatory animus by Officer Jones, or to create pretext regarding the legitimate non-discriminatory reasons given by Officer Jones for issuing the citation to Plaintiff. Plaintiff never disputes, after all, that he was violating the law.

In sum, although Plaintiff is the only person that has been cited for a violation of this law in Claremore, the singling out is based on his violation of state law and the safety risks his operation of the golf cart poses compared to others, or simply because he has been caught while others have not. An officer's attempt to keep roadways safe for Plaintiff and other vehicles does not constitute intentional discrimination. *See Dillery v. City of Sandusky,* 398 F.3d 562, 568 (6th Cir.2005) (affirming grant of summary judgment where police were "keeping roadways safe for both [disabled Plaintiff] and others" where Plaintiff was operating her wheelchair in the street and causing hazard).

### 3. *Retaliation*

■ The ADA regulations provide that no public entity shall discriminate against an individual because the individual has asserted his rights under the ADA, and that no public entity shall coerce, threaten, intimidate, or interfere with an individual in the exercise of his rights. *See* 28 C.F.R. § 35–134(a) and (b). Retaliation under Title II of the ADA requires a plaintiff to show (1) he engaged in statutorily protected expression, (2) he suffered an adverse action, and (3) the adverse action was causally related to the protected expression. *See Higdon v. Jackson,* 393 F.3d 1211, 1219 (11th Cir.2004). As under Title I, an action is considered "adverse" only if it

results in some tangible, negative effect. *Id.*

■ Construing the record in the light most favorable to Plaintiff, with respect to his claim for retaliation under 28 C.F.R. § 35.134, Plaintiff appears to allege the following as evidence of retaliation: (1) Officer Rick Jones, who arrested him on October 26, 2003, allegedly stated that "I have been reading about you and waiting for you Mr. Young, and I have been looking forward to issuing you this ticket" and that "if I ever see using this golf cart in the future, I will remove it and impound it" and left Plaintiff in the QuikTrip parking lot after ticketing him without offering him a ride home; (2) Chief Perry stated that Plaintiff angers him because it "seems that he is snubbing his nose at us when he drives past the police station in his golf cart"; (3) Plaintiff has been issued five citations since rejection of the proposed ordinance; and (4) Defendant uses two police cruisers to effectuate a stop of Plaintiff.

The comments and actions of Officer Jones on October 26, 2003, as well as the comment by Chief Perry, cannot be said to have had a sufficient "tangible, negative effect" on Plaintiff. The issuing of the five citations could, in contrast, be found to have the "tangible negative effect" of a fine and a record of citation. However, the Court finds Plaintiff cannot establish the "causal relation" element or show that the tickets are related *in any way* to Plaintiff's having asserted his ADA rights. This is for the similar reasons explained above with respect to Plaintiff's claim for intentional discrimination. Further, Officer Jones testified that all he had heard about Plaintiff at the time he ticketed him was to look out for him because he could cause a safety problem when the police cars were "running hot." Construing the comments and surrounding circumstances

in favor of Plaintiff, the Court finds that Plaintiff has not created an issue of fact as to whether he was ticketed on any occasion for a reason other than his violation of the law.

### 4. Licensing Requirements

Plaintiff argues that Defendant "is trying to exclude Plaintiff from the benefits of being able to use the streets of Claremore by imposing conditions on disabled persons that he must pay a fee to operate a mobility device, either a driver's license, or insurance in his own name." However, the citations Plaintiff has received are for violation of the law prohibiting operation of golf carts on streets and highways, not for failing to have a driver's license or insurance in his own name. Further, the Court does not rely on Plaintiff's lack of driver's license or insurance in his own name in reaching its determination that Plaintiff's operation of a golf cart in the requested manner poses a direct threat, and a significant safety risk. Further, there is no requested modification before the Court to consider that involves a driver's license or insurance requirement, since Plaintiff requests unfettered access.

## VI. Equal Protection and 42 U.S.C. § 1983 Claims

■■ Defendant moved for summary judgment on Count II, which alleges a violation of the Equal Protection Clause. A state or local government "violates the Equal Protection Clause if it makes distinctions between the disabled and nondisabled without a rational justification," or if it acts with invidious intent. *Thompson v. Colorado,* 278 F.3d 1020, 1030 (10th Cir. 2001). Plaintiff alleges that Defendant is

"violating Plaintiff's rights to equal protection of the law guaranteed by the Fourteenth Amendment ... by enforcing state statutes in an arbitrary manner so as to deny groups of individuals with disabilities the same opportunity as groups of related non-disabled persons." (Compl., at 10.) Plaintiff appears to claim that, by allowing the crossing at Heritage Hills Golf Course but not allowing Plaintiff to operate his golf cart, Claremore is applying state law in an arbitrary manner that violates the Equal Protection Clause. As set forth above, the Court does not find sufficient evidence of invidious intent against Plaintiff or the disabled. Further, because the disabled are not a protected class, Defendant needs only a rational basis for any distinction in its treatment of the disabled and nondisabled. The Court finds that, based on the safety precautions taken at Heritage Hills and the very limited nature of the crossing, Claremore has a rational justification for not ticketing the golfers and ticketing Plaintiff. Plaintiff cannot show that he is treated differently from others "under like circumstances and conditions." *See Power Mf'g Co. v. Saunders,* 274 U.S. 490, 493, 47 S.Ct. 678, 71 L.Ed. 1165 (1927).[20] Further, Plaintiff failed to present the Court with any case law or argument on this issue to defeat summary judgment in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

Defendant also moved for summary judgment on Count III, which alleges a violation of 42 U.S.C. § 1983. To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried

---

**20.** Although Plaintiff also alleges certain salesman at Suburban Chevrolet drive golf carts from the dealership to local restaurants, Plaintiff has presented no evidence that officers have seen this behavior and failed to

ticket. In fact, Chief Perry sent an officer to inform employees at Suburban Chevrolet that they would be ticketed if they drove their golf cart on public streets.

out by an official with final policy making authority with respect to the challenged action." *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1229 (10th Cir.2001). Because the Court has granted summary judgment as to Plaintiff's Equal Protection claim, there is no constitutional violation at issue in this case, and summary judgment is appropriate as to Plaintiff's claim under 42 U.S.C. § 1983. Further, Plaintiff again wholly failed to present the Court with any case law or argument on this issue to defeat summary judgment in Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

## VII. Conclusion

Defendant's Motion for Summary Judgment (Docket No. 47) is hereby GRANTED in its entirety.